## Penick v. White & Beauchamp et al.

(Decided May 8, 1936.)

J. R. ESKRIDGE for appellant.

MOORMAN & BEARD and ALLEN P. CUBBAGE for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

In May, 1925, appellant and James Pool bought a 285-acre farm in Breckinridge county, and entered into a written contract wherein it was agreed that Pool was to move on the farm and operate it, each partner to share equally in profits, expenses, and cost of operation.

During the operation the partners became indebted to the Federal Land Bank, securing the payment thereof by a mortgage, and later executed a second mortgage to secure an indebtedness to the Farmers' Bank & Trust Company. The dates, amounts, and balance due on these debts at the time Pool bought out Penick, as he later did, are not clear from the record. On October 28, 1929, Pool purchased from Penick his one-half undivided interest in the partnership, and on the same day executed a mortgage to Penick, and ''in addition to the obligations in the deed,'' by which he assumed payment of the debts due the banks, executed a note to Penick for $3,000. This mortgage to Penick included the personal property located on the farm consisting of implements, equipment, live stock and provender. Amongst the live stock mortgaged were eleven head of cattle, afterwards sold to appellees, the proceeds of this sale forming the basis of the controversy here.

In the spring of 1932, White & Beauchamp, who were and had been extensive dealers in live stock, traded with Pool for this eleven head of cattle which were included in the mortgage from Pool to Penick. As to whether this was a closed transaction at that time, or in the fall of the same year, is the question disputed.

In November, 1932, Penick brought suit against the purchasers of the live stock. White died before the trial, but Beauchamp qualified as his personal representative and in that capacity was made a party defendant. Pool was not made a party. Penick alleged that by the execution of the mortgage by Pool he had secured a lien on the live stock sold to appellees, and

that "when the live stock was sold to these defendants he notified them not to remove the said property from the farm where it was"; but that they did remove same and sold them, keeping the proceeds, the amount of which he does not know, but avers that the stock was reasonably worth $500. In his prayer he asks judgment for the above sum or such amount as it may develop the appellees received from the sale. Demurrer to the petition was overruled.

Appellees by answer denied generally the allegations of the petition, and specifically so much thereof as averred that they had notice from Penick of the lien, or that he had notified them of his objection to their removal from the premises. The purchase of the cattle was claimed to have been under circumstances and conditions affirmatively pleaded, among which was the partnership operating agreement between Penick and Pool; that during its existence Pool exercised all the rights under it, holding possession of the stock, making all purchases, selling the products of the farm, paying partnership obligations, and demonstrating complete authority in the operation of the partnership "openly and generally without consulting Mr. Penick."

They say that at the time of the execution of the mortgage it was specifically agreed and understood between the parties that the mortgage was given to protect the rights of Penick "against outside parties," and that Pool should continue to exercise the right to sell and dispose of any of and all the mortgaged property to meet "partnership obligations," and pursuant to said agreement Pool continued to sell said property and apply the proceeds to the payment of partnership obligations, "all with the knowledge and consent of said D. T. Penick." They further set out that the cattle bought from Pool were some of the original cattle sold by them to Penick and Pool in 1925, they then selling them about forty head at the price of $1,400, of which $1,000 was paid in cash, leaving a balance of $400, which was carried by appellees in a running account between them and the partnership; that during all the time from the date of the sale of the cattle to the partnership to the close of the account, Pool bought from them live stock and feed, and sold to them live stock, tobacco, and other farm products, and had applied the proceeds of sale as agreed, all with the knowledge and

consent of appellant, and that under the agreement between Penick and Pool, and by Penick's acquiescence and agreement to the continued sales and payments on indebtedness made by Pool, he was estopped to complain of the sale of the eleven head of cattle.

They also pleaded that they had advanced money to Pool to apply on the payments due to the Federal Land Bank on the mortgage debt; that Pool was in arrears and they advanced money, which Pool paid, thereby protecting Penick from the possibility of a deficiency judgment against him in case the land was sold for less than the accumulated debts. Other matter is pleaded which was of more probative than defensive effect, and which might have been stricken on a proper motion. As far as the record here discloses, there was no demurrer to the answer, nor was it controverted by reply or otherwise. While in the pleadings it is not alleged, but in proof it does appear that the partnership between Penick and Pool was dissolved at some unstated time, probably after or about the time of the sale to Pool in 1929, but it is noticed that Mr. Penick does not say that he notified White & Beauchamp, and Beauchamp (the living member of the firm) says that they never heard of the dissolution, continuing to trade with Pool as had been done since 1925, when the original cattle were sold to the partnership.

After proof was taken, the cause was submitted on the pleadings, proof, and exhibits, the court adjudging that appellant take nothing by his petition, and it was dismissed over the objection of appellant who prayed and was granted an appeal. Request was made by plaintiff for a separate finding of facts and conclusions of law. The record does not show what disposition was made of this motion, nor does it contain a separate finding of facts.

Motion was made for a new trial based on these grounds; (1) that the decision is not sustained by the evidence and (2) because the decision is contrary to law.

In brief for appellant it is said,

"It was agreed by the parties, which agreement was not written in the mortgage, but was verbally agreed between Penick and Pool, that Mr. Pool

could sell the mortgaged property or some of it, providing he applied the proceeds of the sale as a credit on the partnership indebtedness. There is no disagreement on this proposition between Pool and Penick.''

In surveying the evidence, we find that Penick frankly admitted that agreement. Mr. Pool says that he acted under and fully complied with the agreement, so this, as a matter of proof, need not be further discussed.

It is said in appellant's brief that the sale of cattle was not made until the fall of 1932, at a time after Mr. Penick had notified White (who has since died) not to remove them from the farm. It is further argued that the mortgage having been recorded, White & Bauchamp thereby had ample notice of the lien, and lastly it is urged that Mr. Pool did not apply the proceeds of the sale of the mortgaged cattle to the payment of partnership debts.

On the first contention it appears from the proof that in the spring of 1932, when Pool was trying to raise money, a bargain was struck between Pool and the purchasers regarding the sale of the cattle. The purchasers had advanced Pool $130 in the fall of 1931 to meet the payment due to the Federal Land Bank. It is claimed by Beauchamp and so stated by Pool that they had advanced him $100 with which to pay taxes, whether on the land or personal property does not appear. At the time of the trade Pool got from them another $130 to meet the March payment to the Federal Bank, and also $40, which he says was to pay and did pay a store account of one of his tenants. The agreed price of the cattle was $300, and more than this amount had been and was paid at the time of the trade for which credit was given the partnership by the purchasers.

As a part of the trade, it was agreed that since the cattle were not in marketable condition, Pool was to keep them until later, furnishing feed to prepare them for the market. Beauchamp removed the cattle some time in the fall of 1932. Both Beauchamp and Pool say that at the time of the trade Beauchamp turned his bull in with the cows on the Pool farm, and it was understood that the purchasers were to have and they

did get the calves. Both say that the cattle were not worth $300 at the time of the trade (in the spring), and that the cows with their offspring were not worth more than that when they were turned over to the purchasers. Appellees contend that there was payment, delivery, and possession in March or early in the spring. Both Pool and Beauchamp say that the trade was completed, and delivery made in the spring, but the cattle were to be kept and fed by Pool until the purchasers called for them when the purchasers determined that they were ready for the market, hence there was naught to be done to complete the sale and passing of title. The price was agreed on and paid; the purchasers were given control and dominion over them with the right to remove or sell them at any time. In Kentucky Motor Car Co. v. Darenkamp, 162 Ky. 219, 172 S. W. 524, 525, we held that

> "in law, there is a delivery of property by a seller to a purchaser when the seller places the property at the disposal of the purchaser and relinquishes to the purchaser the control and right of control of, or dominion over, the property and the purchaser takes, or accepts, the control and right of control, or dominion, over the property."

From the proof it would appear here that after the trade in the spring of 1932, Pool was merely a bailee of the live stock. We must conclude the court so found the fact to be, and since there was ample proof to uphold his view, we are not at liberty to hold to the contrary. On the matter of appellant's contention that the proof shows that the proceeds of the sale were applied to individual indebtedness of Pool, rather than to partnership indebtedness, the same may be said as we said in relation to the proof on the question of when the title of the cattle passed to the purchasers. The determination of the question was one largely of fact. As said in the outset, it was not a matter of dispute that Penick, at the time of the mortgage to him by Pool, put him in possession and gave him direct authority to dispose of the personal property and apply the proceeds of sale to the partnership indebtedness. Mr. Pool says he thought it was put into the mortgage. Mr. Kincheloe, who wrote the mortgage, thought so. On cross-examination Mr. Penick was asked:

"Is it not definitely agreed and understood from

your statement * * * that you did agree and give him authority to sell any mortgaged property that was included in the mortgage and apply the proceeds on the joint indebtedness of Penick and Pool?'' and he answered: ''Certainly. I stated that all the time.''

It appears from the proof of Mr. Penick that after 1929, when Pool had bought the place and executed the mortgage, he continued to sell the mortgaged property without objection by Mr. Penick. In 1931 Pool sold calves and tobacco to the appellees to the amount of $1,100 or $1,200, and deposited the proceeds in the bank. Penick knew of this, but did not know or seem to be interested in how they were applied. He also knew of other sales by Pool, but did not know how the proceeds had been applied.

Appellant's complaint that perhaps the proceeds of sale were not properly applied would address itself to Pool (not a party to the suit) rather than to the purchasers. If the sale and purchase were made in good faith, and they so appear to have been, and Pool failed in the application of the proceeds, he violated a trust imposed in him by Penick. The purchasers had no notice that they should look to the proper application of the proceeds. This being true, and the purchasers having acted in good faith, they should not be required to account for the proceeds to Penick. If their possession was rightful (and we think it was), an action for conversion would not lie against them. Townsend v. Frazee, 54 S. W. 722, 21 Ky. Law Rep. 1183. See, also, Moberly's Guardian v. Mt. Sterling Nat. Bank, 187 Ky. 403, 219 S. W. 423.

As to the right of Pool to sell the property under the admitted agreement, there can be little doubt. In 5 R. C. L. sec. 79, it is said with regard to sales of property under chattel mortgage:

''The mortgagee by consenting that the mortgagor may sell the property waives his lien on the property and has no rights against the purchaser.''

Appellant relies on Ruby v. Cox & Grayot, 191 Ky. 162, 229 S. W. 127, wherein we said:

''As the mortgage was of record, and Ruby and Hollingsworth had actual knowledge of its exist-

ence before they finally took and converted the cattle to their own use and benefit, it seems clear that they are liable to the mortgagees Cox and Grayot, for at least the amount of the mortgage debt if it did not exceed the value of the cattle, if not the alleged sale price, unless the mortgage was fraudulent and void.''

However, it will be noted that elsewhere in that opinion we said:

''The maker of the mortgage was bound. He had no right whatever to take or dispose of the cattle after he made the mortgage, except with the agreement and consent of Cox and Grayot. Ruby and Hollingsworth took the cattle with full knowledge of the mortgage, and that Roll did not have the right to dispose of them.''

So there seems to be an admitted element here, which did not exist in the case above quoted.

On the whole case in the face of the frank and unqualified admissions of Mr. Penick that he authorized Pool to sell the mortgaged property, and he not objecting to sales having been made during and after the dissolution of the partnership, his inactivity in looking after the property, and the application of the proceeds of sales until after he had learned that Pool was a bankrupt, and the very prominent fact that the sale and purchase in question seem to have been made in the best of faith, we must conclude that the court below properly adjudged that appellant was not entitled to the relief sought.

Judgment affirmed.