EDWARD SCHWARTZ, receiver of FILM AUTOMATIC CORPORA-
TION, complainant-appellant,

*v.*

EDWIN H. MAGUIRE, CHARLES MAGUIRE, WALLACE & TIER-
NAN PRODUCTS, INC., defendants-respondents, and
BLOOMFIELD TOOL CORPORATION, defendant-appellant.

[Argued February 5th and 6th, 1942.   Decided April 23d, 1942.]

*Mr. Joseph L. Lippman,* for the complainant-appellant.

*Mr. Philip Goodell* (*Mr. Charles R. L. Hemmersley,* of counsel), for the defendant-appellant Bloomfield Tool Corporation.

*Mr. James P. Mylod,* for the respondents Edwin H. Maguire and Charles Maguire.

*Mr. William J. Egan* (*Mr. Robert L. Hood,* of counsel), for the respondent Wallace & Tiernan Products, Inc.

The opinion of the court was delivered by

HEHER, J.

We are of the view that the chattel mortgages are void with respect to the Film Automatic Corporation's creditors as transfers of its property in contravention of *R. S. 1937, 14:14-2.* They were given to secure a pre-existing indebtedness, and are not therefore supported by a "valuable consideration" within the intendment of the clause exempting from the operation of the statute a conveyance to a *bona fide* purchaser for a valuable consideration, without notice of the insolvency, or of the sale being made in contemplation thereof, before the corporation shall have actually suspended its ordinary business. *Hersh* v. *Levinson Bros., Inc., 117 N. J. Eq. 131.*

True, as laid down in the cited case, the mere inability of a corporation to meet a maturing obligation does not signify insolvency in the statutory sense. Insolvency, within the view of the statute, denotes a general inability to meet liabilities as they mature, by means of either available assets or an honest

use of credit. The circumstance that the liabilities of a corporation exceed its assets does not necessarily constitute insolvency. A corporation so situated which is actively pursuing its regular business, with a reasonable expectation that business conditions will improve, and that it will be re-established on a sound financial basis, is not insolvent in the legislative meaning. A distinction is to be made between a general inability to meet maturing obligations and a temporary financial embarrassment. A corporation may pledge its assets to raise money necessary to relieve it of pecuniary difficulty and permit it to continue business. It may employ its credit to obtain renewals of its bills payable and extensions of time for the payment of other obligations. Such would unquestionably be an "honest use of credit."

Here, insolvency had intervened. The corporation was not then able to meet its liabilities as they matured, either through available assets or an honest use of credit. It was not confronted with a mere "temporary financial embarrassment" solvable by the use of its credit. Rather, its predicament was such as to induce the adoption of a scheme designed to place its assets beyond the reach of creditors pending efforts to procure large investments of capital—a hope never realized, and one utterly without reason, in our judgment.

The Film Corporation was engaged in the business of assembling film-cutting and splicing machines. The instruments were then leased to film exchanges at a fixed weekly rental. The object was to establish the business on a basis that would require the raising of capital in the sum of $500,000 through a debenture bond issue. The floating of the bond issue was undertaken by a New York brokerage house, which failed after it had sold bonds in the aggregate sum of $110,000. This sum had been turned over to the Film Corporation at the rate of between $10,000 and $15,000 per month. Most of the corporation's assets, consisting largely of patents, had been hypothecated in this venture. The insolvency of the brokers precipitated a financial crisis for the corporation. This source of capital ceased in June, 1937; and, in the ensuing December, the corporation was forced to dismiss its staff of employees (except the superintendent and a book-

keeper) for lack of funds, and to discontinue "operations." It was unable to meet the "shop payroll" after the week of December 23d; and "office salaries" had been "stopped several months before." Its only income then was the rental of the machines running between $170 and $180 per week. Efforts continued to sell the remainder of the bonds through other brokers.

Rent for the corporation's premises, at the rate of $125 per month, became in default for the months of January, February and March, 1938. Distress proceedings were instituted by the landlords on March 16th; and thereupon the corporation and the Bloomfield Tool Corporation, who was a creditor to the extent of about $10,000 for machine parts sold and delivered, and whose premises adjoined the corporation's, entered into a plan plainly intended to safeguard the insolvent corporation's assets against the claims of its creditors in the hope that eventually the needed capital could be had. By prearrangement, the Tool Company purchased the corporation's physical assets at the distress sale, held on May 2d, 1938, for $548.20, subject to a second levy made by the landlords for unpaid rent for the month of April, 1938. One of the chattel mortgages in question, covering property situate in New Jersey, was given to the Tool Company on March 31st, 1938; and the other, covering property in New York, was made to it on April 14th, 1938. As stated, the consideration was the pre-existing indebtedness. Thereafter, the Tool Company paid the rent for the month of April, and rented the premises from the landlord on a monthly basis at the same rent of $125. The Film Corporation remained in possession thereof and paid rent at this rate to the Tool Company, who, in turn, paid it over to the landlords. The corporation continued to receive the rental of the machines at the stated weekly rate. Part of this income had been assigned as collateral security for a debt owing to respondent Wallace & Tiernan Products, Inc., but the surplus, although much more than sufficient for the purpose, was not devoted to the payment of the accruing rent constituting the arrears. And there was no appeal to the other stockholders for funds for that purpose.

The Film Company's president testified that all this was with the view of keeping the business intact awaiting the needed capital. He said that the Tool Company had agreed to return all the property upon the repayment of the sale price and the liquidation of the subsisting indebtedness; that this course was taken to enable the Tool Company "to protect themselves * * * until such time as" the corporation "could pay it back;" that "it was understood they would get a chattel mortgage to protect them," and he agreed to that "because it put us in a position to carry on;" that the corporation had then ceased factory operations, and was unable to pay its creditors, and its officers "were just hopeful of making new financial arrangements so that we could carry on;" that the Tool Company took the premises under a monthly tenancy agreement so that the corporation could "keep the place going" and thus "show what" it "had there to get new backers interested;" that "we both jointly agreed that they [the Tool Company] would put up the rent of $500" to "save the thing and prevent anybody from disturbing the picture until we got finances, and they would give it back to us after we paid them;" that the Tool Company agreed that "so long as I paid the $125 a month, * * * they would let the goods stay where they were, * * * even though we were not in operation, for the purpose of showing new people what the plant looked like;" and that the "main asset to us was the looks of it; to keep the place looking like a going concern anyway."

It is conceded that the price thus bid and paid for the goods sold in the distress proceedings was but a fraction of their real value. Prior to the institution of the distress proceedings, two actions had been brought by creditors of the corporation, each to recover approximately $100. These claims were met through funds advanced by the Film Corporation's president. While the Tool Company's executives denied that such was the object of the arrangement, the course of conduct of the parties is fully corroborative of the evidence so elicited from the corporation's president. We have had no difficulty whatever in arriving at this as a factual conclusion.

Thus the corporation was not, at the time of these trans-

fers, actively pursuing its regular business with a "reasonable expectation" that business conditions would improve and it would be re-established on a sound financial basis. This was not a mere "temporary financial embarrassment" which would be met by improved business conditions. While there may have been an expectation of additional capital in an amount sufficient to render the business financially stable, it was plainly not grounded in reason. The Tool Company was fully aware of the fiscal condition of the corporation, and entered into the scheme for the purpose indicated, using the circumstances to secure a preferential transfer at the expense of the other creditors of the insolvent corporation.

And we are of opinion that the sale of the chattels in the distress proceedings should not be set aside, subject to a lien for the moneys thereby expended by the Tool Company. The receiver prays this relief on the ground that the distraint was excessive. It suffices to say that the ends of justice will be served in this litigation by decreeing the Tool Company to be a constructive trustee of the chattels for the creditors of the insolvent corporation; and, since it is not disputed that it has a lien for the moneys advanced thereon, the decree should not be disturbed in this regard.

And by the same token, the decree in favor of the landlords should be affirmed.

We find no merit in the receiver's appeal from the provisions of the decree in favor of the respondent Wallace & Tiernan Products, Inc.

This appeal is not based upon the merits, but rather upon the grounds that the receiver was "not authorized to institute suit" against this party, and it had been agreed that "the only purpose of Wallace & Tiernan being made a party to the said proceeding was to adjudicate the respective rights between Wallace & Tiernan and Bloomfield Tool, and in no way to affect the rights of your petitioner or that a decree be entered against him in any respect whatsoever."

The appeal in this regard is frivolous. The bill of complaint alleges full authority in the premises. The question was not raised in the court below until after the issue had been adjudicated on the merits; and then only by *ex parte*

affidavits. In the circumstances, the motion to dismiss the bill as to this respondent was properly denied. There was no jurisdictional lack. Compare *McCandless* v. *Furland, 293 U. S. 67; 55 S. Ct. 42; 79 L. Ed. 202.*

The decree is accordingly modified, and, as so modified, affirmed, with costs in favor of the prevailing parties.

*For modification*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, JJ. 13.