**In re JORDAN INDUSTRIES, INC., Bankrupt.**

**EMERY AIR FREIGHT CORPORATION, Plaintiff,**

v.

**JORDAN INDUSTRIES, INC., Defendant.**

**Bankruptcy No. EBK79–00250.**

United States Bankruptcy Court, N.D. Mississippi, E.D.

April 25, 1983.

James Hugh Ray, of Lumpkin, Holland, Ray & Upchurch, Tupelo, Miss., Malcolm M. Gaynor, David N. Missner, and Daniel A. Zazove, of Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for defendant.

Terry Morris, of McCormick & Morris, Oxford, Miss., Edward R. Burr, Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION

EUGENE J. RAPHAEL, Bankruptcy Judge.

On August 3, 1979, the bankrupt, Jordan Industries, Inc. (hereinafter called Jordan), filed its petition for an arrangement under chapter XI of the Bankruptcy Act of 1898, as amended.

On October 15, 1979, plaintiff, Emery Air Freight Corporation (hereinafter called Emery), filed its proof of claim for air freight charges in the sum of $16,840.74.

There appears in the jacket file of this case a document entitled "Objection to Al-

lowance of Claim of Emery Air Freight Corp.", dated October 31, 1979, bearing the corporate signature of Jordan. Presumably said objection was lodged with the other papers in this case promptly after the date shown on said objection, but it was not marked "filed".

On November 15, 1979, the bankrupt, Jordan, filed its motion for leave to file an amended objection to the allowance of the claim of Emery and a counterclaim to said claim. The said "Amended Objection to Allowance of Claim of Emery Air Freight Corporation and Counterclaim" were marked filed on November 15, 1979, apparently through inadvertence, but the court ratified such filing by its order entered on November 28, 1979, granting said motion for leave to file an amended objection and a counterclaim. The prayer of said counterclaim was "That Jordan Industries, Inc., have judgment against Emery Air Freight Corporation in the amount of $35,898.01 less any credits to which Emery Air Freight Corporation may be entitled".

On December 19, 1979, plaintiff, Emery, filed its answer to the counterclaim of Jordan.

On March 25, 1981, this court conducted the trial of the said objection and of the said counterclaim. At the conclusion of the trial the court reserved its decision and permitted counsel for the respective parties to file briefs. On August 26, 1981, Jordan filed its brief, and on January 4, 1982, Emery filed its brief. By letter received by the court on January 7, 1982, Jordan elected not to file a reply brief to that of Emery; and the issues were submitted to the court.

During the months of May, June and July, 1979, Jordan, defendant and counterclaimant herein, delivered to Emery, plaintiff, various quantities of skate board components, etc., for shipment to Jordan's customer, Viraflex C.A., at Caracas, Venezuela. It was Jordan's contention that all of said merchandise was delivered to and accepted by Emery under an agreement that all air freight charges would be invoiced to Jordan on an open account basis. Various documents such as invoices, way bills, let-

ters, etc., were introduced in evidence in an effort to corroborate Jordan's view of such agreement. On the other hand, Emery pointed out that numerous ambiguities appeared in such documents. For example, copies of letters of instruction as to open account billing for freight charges were attached to some of the invoices, but other invoices were introduced without attached copies of such letters. On some of the documents the terms "F.O.B. Booneville, Miss." were printed without alteration, but on other invoices the term "F.O.B." was obliterated and on other invoices the "FOB" remained while "Booneville, Miss." was obliterated. There was also typewritten just below said printed terms the symbol "C.I. F." on several of the invoices. On some of the invoices there also appeared below the description of the merchandise the language "F.O.B.–C.I.F." On none of the invoices was a geographical location named adjacent to the term "CIF". One of Emery's Miami, Florida, employees testified that a long-standing unwritten company policy required that when such delivery terms were in doubt, the air freight should nevertheless go forward on a collect basis to the consignee. Whatever may have been the agreement, if any, between the parties, some of the subject air freight charges were handled on an open-account basis, but others were handled on a basis that required collect payment on delivery from Jordan's customer, Viraflex C.A. The payments handled on such collect basis aggregated $35,-898.01. Viraflex C.A., having been required by Emery to pay the said collect freight charges, demanded of Jordan that it require Emery to refund said sum of $35,898.01 to Viraflex C.A. or else Viraflex C.A. would take credit therefor on its account with Jordan. Such demand was made in Caracas in late July, 1979. The record is unclear as to whether or not any credits were so taken before the filing of the chapter XI petition on August 3, 1979. Indeed, there is no specificity of evidence in this record to show the precise dates and amounts of the taking of such credits, if any. It is uncontradicted, however, that Emery did not refund any portion of said sum of $35,898.01.

Emery made a prima facie showing as to its claim for unpaid air freight charges by introducing its proof of claim in the amount of $16,840.74. There is no contradiction as to the accuracy of the amount of such claim asserted by Emery. The question for resolution herein is whether or not Jordan has sustained its burden of proof as to the counterclaim, which is predicated on the theory that the facts in this record show a preferential transfer violative of the Bankruptcy Act of 1898, as amended.

The long established and controlling legal principles are aptly stated in the following cited authorities:

In *In Re Nizolek Furniture and Carpet Company,* 71 F.Supp. 1012 (1947), The United States District Court for the District of New Jersey stated, inter alia, at pp. 1014 and 1015:

"[1] Section 60 of the Bankruptcy Act, and particularly subdivisions a and b, 11 U.S.C.A. 96, subs. a and b, is determinative of the question raised by the first ground. This section defines a preference as a "transfer, * * *, of any of the property of a debtor to or for the *benefit of a creditor* for or on account of an *antecedent debt,* made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, * * * *the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.*" (Emphasis by the Court.) It seems reasonably clear, upon proper construction of this section, that there can be no preference in the absence of any one or more of the elements.

[2] The contemporaneous assignments of the accounts receivable were not made in payment of or as security for an antecedent debt, and the relationship between the Bankrupts and the Corporation at the time of the assignments was not that of debtor and creditor. The essential elements of a preference, as defined in the Act, were obviously lacking...

[3] The transfer of property in the usual course of business for a present adequate consideration, and not in payment of or security for an antecedent debt, is not a preference... Such a transfer does not effect a depletion of the bankrupt's property to the injury of other creditors, an essential element of a preference, ... but enhances the bankrupt's assets to the extent of the consideration advanced...
[4, 5] It is well recognized that a preference may be avoided under Section 60, sub. b of the Bankruptcy Act, 11 U.S.C.A. 96, sub. b, only "if the creditor receiving it * * * has, at the time when the transfer is made, *reasonable cause to believe that the debtor is insolvent.*" ... Proof of this prerequisite is significantly absent in the instant case. (Emphasis supplied)
[6] There is evidence from which it may be inferred that the Corporation was *suspicious of the Bankrupts' precarious financial condition* in December of 1941, and perhaps prior thereto. The evidence, however, will not *support* an inference that the Corporation had a reasonable cause to believe that the Bankrupts were insolvent. Ibid. The term *"reasonable cause to believe," as used in the Act, presupposes a knowledge of such facts as would produce in the mind of a reasonably intelligent person a well founded belief, as opposed to a mere suspicion, that the bankrupt was insolvent at the time of* the transfer. Ibid." (Emphasis supplied)

In *In re Zaferis Bros. & Co., Limited,* 67 F.2d 140 (1933), the Circuit Court of Appeals for the Ninth Circuit held, inter alia, at p. 141:
"*While appellant received a sum of money from Zaferis which satisfied part of the debt owed it by the bankrupt, other creditors did not suffer thereby. Two creditors were substituted for one, but bankrupt's total indebtedness was unchanged.* Its estate was therefore unaffected by the transaction.
[1, 2] Appellee urges, however, that the corporation note evidences a borrowing by it from James Zaferis and therefore,

though James Zaferis dealt directly with appellant, there was nevertheless a moment at which the sum loaned was in bankrupt's control; and *that thus the payment to the bank was in law made by bankrupt.*

*The contention is untenable...*

*It therefore lacked the primary element of a preference, that of a transfer of the bankrupt's property... It is well settled that payments by third parties of their own money do not constitute preferences...*" (Emphasis supplied)

In a scholarly work on this subject, *Fraudulent Conveyances and Preferences,* Rev.Ed. (1940), Vol. II, as supplemented, author Glenn Garrard wrote in section 403 at page 690:

"The idea, *that a preference means diminution of the debtor's estate has been stated so often as the test of a preference,* that a footnote reference will suffice. And, inasmuch as *the test is the same with both fraudulent conveyance and preferential transfer,* the reader is referred to the earlier chapter which outlines various methods of diminishing a debtor's estate. To that discussion, we have only to add several points, which are of peculiar interest in the case of a preferee. One will be discussed forthwith, and the others will feature sections that immediately follow.

The first thought is that a payment cannot be a preference unless the debtor makes it, or some one makes it for the debtor, and *out of his estate. In other words, a payment made by a third person with his own money cannot be the debtor's preference because it does not come from the debtor's estate, which necessarily remains of the same size after the payment as it was previously. Even if the person who makes the payment acquires thereby a right to reimbursement, that does not increase the debtor's liabilities, for the new claim replaces an old one that otherwise could have been asserted, and so the dividend rate will remain the same...*" (Emphasis supplied)

Assuming, arguendo, that the agreement between Jordan and Emery was exactly as contended for by Jordan; and assuming further, arguendo, that Emery violated the agreement in the instances wherein Emery collected the air freight charges from the consignee instead of billing them on open account to Jordan; the foregoing quoted authorities nevertheless refute the idea that there was a preferential transfer or that there were preferential transfers occasioned by the actions of Emery. The facts do not support a proper showing of an antecedent debt. Affirmatively, the facts show collections of contemporaneous charges for air freight shipments by Emery. The adequacy or reasonableness of the air freight charges or consideration has not been attacked herein. There is insufficient evidence to show that Emery possessed any facts which would give rise to reasonable cause to believe that Jordan was insolvent during the course of Emery's dealings with Jordan. As a matter of fact, the evidence did not even show any basis for suspicions of insolvency during pertinent periods of time. The only effect of the payments of the collect air freight charges by the consignee was that the consignee replaced Emery as a creditor for such charges against Jordan. The payments by the consignee were simply payments by a third party of its own money, not that of the bankrupt.

Beyond that, however, counterclaimant Jordan did not sustain its burden of proof as to the alleged agreement as to the handling of the said shipments. Any supposed verbal understanding in that regard was rendered totally ineffectual by a multiplicity of ambiguous and contradictory written shipping terms set forth on the faces of large numbers of shipping documents. This court is of the opinion that Emery was forced into the improvisation of shipping some items collect because of the exigent circumstances related to time elements shown by the record. Jordan has shown no legal duty on the part of Emery to seek additional verbal interpretation on top of the varying written markings on the invoices. Time demands as to individual shipments did not permit the obtaining of clari-

fying written stipulations. By relying on long standing company policy (albeit unwritten) and international trade rules, Emery was simply performing its primary duty to deliver the air freight within extant time constraints. In this court's opinion, no preferential transfers have been shown.

An appropriate judgment will be entered.